**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| MITRA ABBASI,<br>              Plaintiff,<br><br>       v.<br><br>SMITHKLINE BEECHAM CORP<br>D/B/A GLAXOSMITHKLINE; and<br>ALEXANDRE G. LANCKSWEERT,<br>              Defendants. | Civil Action No. 08-277 |

**OPINION**

March 25, 2010                                                    Pollak, J.

Plaintiff Mitra Abbasi brought suit against GlaxoSmithKline (GSK) and her former supervisor at GSK, Alexandre Lancksweert, for employment discrimination on the basis of her national origin (Iranian) and her race (Persian). The parties by stipulation (Docket No. 22) dismissed the first four counts of the amended complaint (Docket No. 6) which included claims under Title VII of the 1964 Civil Rights Act for harassment, disparate treatment and retaliation, and a claim under the Pennsylvania Human Relations Act. The remaining count is for discrimination in violation of 42 U.S.C. § 1981. Both defendants moved for summary judgment (Docket Nos. 37, 38) and the plaintiff responded (Docket No. 41). The defendants filed a reply (Docket No. 44) and the

1

plaintiff was allowed leave to file a sur-reply (Docket No. 46).  The motion is ripe for disposition.

## I.  Background and Procedural History

### A.  Facts

The plaintiff, Mitra Abbasi, is a native of Iran.  Pls.' Ex. 1 (PHRC Compl.), at ¶ 7. She is also of Persian ethnicity.  Def. Ex. 4 (Pl's. Dep.), at 127:1-128:17; Def's. Answer ¶ 15.  She holds a B.S. in information systems from St. Joseph's University, which she obtained in 1989, and a master's degree in engineering from Pennsylvania State University, which she obtained in 1994.  Pls.' Ex. 1, at ¶ 8-9; Def's. Answer ¶ 16-17. GSK hired her as a consultant in 1998.  Pl. Ex. 1, at ¶ 10.  GSK hired her full-time as a Clinical Programmer Database Administrator in 2001 and she eventually became a member of the Metrics group.  Pl. Ex. 1, at ¶ 10-11; Def. Ex. 5 (Palmer's Dep.), at 30:19-21.

In September 2003, defendant Alexandre Lancksweert became the manager of the Metrics group and was Abbasi's direct supervisor.  Pl. Ex. 1, at ¶ 14.  Lancksweert initially worked in the United Kingdom, but moved to the United States in 2005.  Def. Ex. 4 (Pl's. Dep.), at 11:6-10.

Abbasi in her deposition testified to several incidents that she believed created a hostile work environment and were instances of discrimination.  First, Lancksweert publicly criticized her during meetings, including yelling at her.  Def. Ex. 4. (Pl's. Dep),

at 18:9-18; Def. Ex. 8 (Ernestine Mitchell's Dep.), at 30:4-5.  These criticisms were severe enough to make Abbasi's co-worker Ernestine Mitchell uncomfortable.  Def. Ex. 8, at 59:24-60:5.  However, the confrontations observed by Ernestine Mitchell were to the best of her recollection "all work-related."  Def. Ex. 8, at 31:4-10.  Others concurred that Lancksweert's treatment of Abbasi was related to what Lancksweert viewed as her poor performance.  Def. Ex. 5 (Helen Palmer's Dep.), at 210:10-20 ("I think because of the performance issue I think he may have interacted with Mitra more often on those issues . . ."); Def. Ex. 7, (Marta Wilson's Dep.), at 118:12-120:12 (stating that Abbasi needed "more guidance" due to "mistakes or overlooking details").  Lancksweert had raised his voice at others frequently.  Def. Ex. 5 (Palmer's Dep.), at 94:22-25.  But, criticisms were directed at Abbasi more frequently than others.  Def. Ex. 8 (Mitchell's Dep.), at 33:22-19.  Helen Palmer and Marta Wilson, senior GSK employees, did not dispute that Abbasi was more frequently the target of Lancksweert's criticisms but ascribed it to her having more issues with her work.  Def. Ex. 5 (Palmer's Dep.), at 210:10-20; Def. Ex. 7, (Wilson's Dep.), at 118:12-120:12.

Similarly, Abbasi found Lancksweert's tone in emails to be demeaning.  Def. Ex. 4. (Pl's. Dep), at 36:9.  She particularly took issue with an email where Lancksweert had pointed out mistakes in a report sent out by Abbasi that she believes were not her mistakes.  Def. Ex. 4. (Pl's. Dep), at 36:25-38:13.

Additionally, Lancksweert gave Abbasi a negative performance review, referred to

at GSK as a Personal Development Plan (PDP), for her work in 2004. Def. Ex. 4. (Pl's. Dep), at 14:3-15:3. Abbasi felt that the 2004 PDP prepared by Lancksweert conflicted with the peer feedback solicited from Abbasi's coworkers in what GSK calls the "360" review process. Def. Ex. 4. (Pl's. Dep), at 13:9-15, 14:21-24. Lancksweert's "Manager's Summary of Overall Performance" in Abbasi's 2004 PDP praises Abbasi as a "committed and enthusiastic member of the team . . . [who] works diligently to communicate the value of [our] tools & reports; and supports the team by forming day-to-day activities." Pl. Ex. 9. It also states she "is passionate about her work." *Ibid.* The comments also contain several criticisms, which form the focal point of plaintiff's arguments, that state her "impact on her colleagues and the wider organisation [sic] is limited by her poor communication skills and the lack of validation on her work," that she "rush[es]-into making presentations with little forethought for the relevance and structure of key messages [and a]s a result, the target audience, while grateful for her support, are confused," and that she "rush[es] her work without conducting the appropriate checks to ensure accuracy & robustness of the analyses." Pl. Ex. 9.

In addition to Abassi's 2004 PDP, the parties submitted the 2003 PDP, written by Helen Palmer, who was primarily supervising Abbasi in 2003. Def. Ex. 5, at 41:21-25. The 2003 PDP for Abbasi, while more positive than the 2004 PDP, states that Abbasi needs to address "the issue of data quality and taking accountability for checking the integrity of reports and other output before allowing them to be published." Pl. Ex. 8.

Palmer stated in her deposition that although Abbasi had accomplished her objectives for that year in delivering certain reports, "[t]here was a lot of rework that had to be done." Def. Ex. 5, at 53:9-54:5. Palmer stated she was not surprised at the criticism Lancksweert included in the 2004 PDP. Def. Ex. 5, at 82:2-5.

Despite Abbasi's claims to the contrary, Abbasi's 2004 "360" peer reviews, while on the balance very positive, contain criticisms similar to those from Lancksweert. Some of the feedback states:

> Mitra could benefit from courses covering interpersonal communication and stress management to improve her ability [to] handle seemingly difficult relationships . . . There are still times when the desire to see a task finishes [sic] overrides the thorough checking and ensuring that the work is fit for purpose. This has lead [sic] to the need for extra checking from other members of the team. The need to double check all work can not be overemphasised [sic] . . .
> Perhaps Mitra could be clearer in her delivery of the message she wants to give. Some people walk away confused.

Pl. Ex. 10.

Lancksweert also gave Abbasi a project without informing her of the deadline when the project had to be completed. Def. Ex. 4. (Pl's. Dep), at 26:1-22. When Abbasi informed Lancksweert that she would complete the project soon, he told her that she was already late and he needed the project completed the day before. *Ibid.* Abbasi believes that Lancksweert intended to set her up to fail on the project. *Ibid.*

Abbasi described several other incidents that she found offensive. Lancksweert told Abbasi that she did not speak English clearly and should take more time to think before she talks. Def. Ex. 4. (Pl's. Dep), at 21:20-22:4. Niall Devine and another female

5

co-worker, whom Abbasi could not identify, were given a project instead of Abbasi, despite the fact that Abbasi had spent more time working in the group.  Def. Ex. 4. (Pl's. Dep), at 22:11-25:3.  Lancksweert criticized Abbasi for working from home and told her that due to her poor performance she could no longer work from home.  Def. Ex. 4. (Pl's. Dep), at 32:17-35:23.  Meanwhile, several other of Abbasi's co-workers were allowed to work from home.  Def. Ex. 4. (Pl's. Dep), at 33:25-34:12.  Lancksweert refused to allow Abbasi to attend a metrics conference in Philadelphia for $300, while others had traveled from the U.K. for similar meetings.  Def. Ex. 4. (Pl's. Dep), at 38:25-40:10.  Lastly Lancksweert gave Abbasi the job description of a low-level metrics analyst and asked her if the position was more suited to her abilities and what she wanted to do.  Def. Ex. 4. (Pl's. Dep), at 41:9-25.

Abbasi was the only member of the Metrics group that was not promoted during the tenure of Lancksweert as the head of the Metrics group.  Def. Ex. 2, (Lancksweert's Dep.), at 46:20-47:24.

On February 18, 2005, Abbasi asked for regular feedback and review from Lancksweert.  Def. Ex. 11.  Her intent was to create a "paper trail" of Lancksweert's criticisms.  Def. Ex. 4 (Pl's. Dep.), at 138:1-139:2.

In response to the above incidents, on May 16, 2005, Abbasi initiated an internal discrimination complaint against Lancksweert.  Pl. Ex. 11.  Sharon McCrae of GSK's CEDER (compliance, equal opportunity, diversity and employee relations) department

investigated Abbasi's allegations against Lancksweert. Def. Ex. 13 (McCrae's Dep.), at 68:17-70:5. McCrae informed Abbasi that she would interview the entire Metrics group and then make a recommendation based on her findings. Def. Ex. 13, at 80:11-81:4. McCrae conducted interviews and took notes of her interviews. Def. Ex. 13, at 114:4-9. McCrae then summarized her findings and provided a recommendation along with a chart summarizing the interviews. Def. Ex. 184:1-16, and Def. Ex. 15.

The parties' versions of events diverge regarding both the conclusion of the investigation and the thoroughness of the investigation. Both sides agree that a memorandum dated December 20, 2005, informed Abbasi that the investigation revealed "insufficient evidence" to support Abbasi's claims of discrimination and a hostile work environment. Pl. Ex. 15. However, Abbasi claims that McCrae verbally informed her that she had confirmed the charge of a hostile work environment in October of 2005, but that McCrae could not prove it was based on national origin or ethnicity. Def. Ex. 4, (Pl's. Dep.), at 83:22-85:1. Abbasi also claims that McCrae's deposition shows that McCrae was unaware of Abbasi's national origin and ethnicity at the time of her investigation. Def. Ex. 13, at 130:23-132:2. But the defendants claim that McCrae was aware of Abbasi's national origin and ethnicity. Def. Ex. 13, at 192:18-193:4. The parties also debate whether the summaries of the interviews support or contradict Abbasi's claims. *See* Def. Ex. 15 (Investigation Summary).

### B. Procedural History

On January 16, 2008, Abbasi instituted this suit by filing a complaint (Docket No. 1). She then filed an amended complaint (Docket No. 6), which the defendants answered (Docket No. 12). The defendants moved to dismiss (Docket No. 13) for failure to state a claim under Rule 12(b)(6). The parties then filed a joint stipulation to dismiss the first four of the five counts of the complaint, which I approved (Docket Nos. 19, 22). By agreement this stipulation disposed of the motion to dismiss. (Docket No. 19). The only remaining count is a claim that defendants violated 42 U.S.C. § 1981.

## II. Discussion

### A. Legal Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *IFC Interconsult, AG v. Safeguard Int'l Partners, L.L.C.*, 438 F.3d 298, 317 (3d Cir. 2006). Facts are material if they "bear on an essential element of the plaintiff's claim." *Fakete v. Aetna, Inc*., 308 F.3d 335, 337 (3d Cir. 2002) (quoting *Abraham v. Raso*, 183 F.3d 279, 287 (3d Cir. 1999)). There is a genuine issue of material fact if "a reasonable jury could find in favor of the nonmoving party." *Id.*

A party seeking summary judgment carries the initial burden of informing the

court of the basis for its motion and identifying the portions of the record that show that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In this instance, the non-moving party would bear the burden of proof at trial. Consequently, the moving party must show that the non-moving party cannot support her case with the evidence in the record. *Celotex*, 477 U.S. at 325. To rebut, the non-moving party must identify facts that create a genuine issue of dispute for trial. FED. R. CIV. P. 56(e); *Hampton v. Borough of Tinton Falls Police Dept.*, 98 F.3d 107, 112 (3d Cir. 1996). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The defendants contend that plaintiffs' claims, other than the claims based on her Persian ethnicity, are not properly brought under § 1981.[1] Defs'. Mot. for Summ. J. at 30-31. For claims of discrimination on the basis of race or ethnicity, the elements of employment discrimination under § 1981 are identical to those in a Title VII claim. *Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 499 (3d Cir. 1999). Section 1981 only

---

[1] Section 1981 states:
All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
42 U.S.C. § 1981.

prohibits racial or ethnic discrimination, and thus Abbasi cannot rely on claims based on "the place or nation of her origin" and her § 1981 claims must be based on "discrimination solely because of [her] ancestry or ethnic characteristics." *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987). Because the remaining counts of the complaint have been dismissed by stipulation, only evidence of discrimination based on Abbasi's Persian ethnicity is relevant to her § 1981 claim.

**B. Disparate Treatment**

A claim for disparate treatment under § 1981 is analyzed under the same standard as a disparate treatment claim under Title VII. The plaintiff may either rely on direct evidence of discrimination or she may use circumstantial evidence under the familiar burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas Framework*, the plaintiff must first come forward with evidence of a *prima facie* case of illegal discrimination. *Id.* at 802-03. The burden then shifts to the defendant to provide a legitimate non-discriminatory reason for the adverse employment action. *Id.* Once the employer has provided a legitimate non-discriminatory reason, the plaintiff has the burden of producing evidence to show that the reason is pretextual. *Id.* at 804. "Our experience is that most cases turn on the third stage, *i.e.,* can the plaintiff establish pretext." *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999).

Abbasi claims that she has presented direct evidence of discrimination because Ernestine Mitchell purportedly ascribed Lancksweert's motive to bias, stereotype, and

discrimination. Pl's. Mem. of Law. in Opp. Of Def's Mot. for Summ. J. at 20. Even if

Mitchell's deposition did contain such a statement, which as I discuss below is

questionable, the belief of a co-worker that the plaintiff suffered discrimination is not

direct evidence. Thus, Abbasi's claim must be evaluated under the *McDonnell Douglas*

framework.

### 1. *Prima Facie* Case

In order to establish a *prima facie* case under *McDonnell Douglas*, the plaintiff

must show 1) she is in a protected class, 2) she was qualified for the position she held,

and 3) she suffered an adverse employment action 4) under circumstances that give rise to

an inference of discrimination. *Jones*, 198 F.3d at 410-11. The *prima facie* case "cannot

be established on a one-size-fits-all basis" and depends "on the facts of the particular

case." *Id.* at 411.

The defendants argue that the plaintiff cannot establish a *prima facie* case of

discrimination because "she cannot show that any similarly situated employee outside of

the protected class was treated differently" to satisfy the fourth prong. Defs'. Mot. for

Summ. J. at 25. The defendants claim that the circumstances of the alleged adverse

employment action cannot give rise to an inference of discrimination.

Contrary to defendants' statement of the law, Defs'. Mot. for Summ. J. at 24-25,

the *prima facie* case is highly factually dependent and plaintiffs need not point to different

treatment for similarly situated employees in every case. *See Sarullo v. U.S. Postal Serv.*,

352 F.3d 789, 798 n.7 (3d Cir. 2003) (noting that under Third Circuit precedent the

plaintiff is not required to point to similarly situated persons, so a woman alleging gender discrimination for her termination is not foreclosed from recovery simply because she was replaced by another woman). Although treatment of similarly situated persons outside the plaintiff's protected class may be highly probative evidence of discrimination, a plaintiff who is not able to cite instances of more favorable treatment of similarly situated non-members of the protected class can still present a *prima facie* case provided that she can point to facts tending to establish that she suffered an adverse employment action under circumstances giving rise to an inference of discrimination.

However, in this case it is unnecessary to address the difficult question of what if anything Abbasi needed to show to present a prima facie case without any similarly situated comparators. The defendants have provided a legitimate non-discriminatory reason and Abbasi has failed to present evidence that the proffered reason presented is pretextual.

### 2. Legitimate Non-Discriminatory Reason and Pretext

The next step in the *McDonnell Douglas* framework "requires the defendant to articulate a legitimate nondiscriminatory reason for the adverse employment action at issue." *Jones*, 198 F.3d at 412. Once the defendant has met its burden of production, the plaintiff must produce evidence sufficient to permit a reasonable jury to conclude that the proffered reason was pretextual. *Id.* The plaintiff must produce some evidence "from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely

than not a motivating or determinative cause of the employer's action." *Id.* at 413 (internal quotations and citations omitted). The nonmoving plaintiff must demonstrate through admissible evidence "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." *Id.* The Third Circuit has described the standard as demonstrating "through admissible evidence, that the employer's articulated reason was not merely wrong, but that it was 'so plainly wrong that it cannot have been the employer's real reason.'" *Id.* (citing *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997)).

### a. Evidence of Poor Perfomance

In contending that the proffered reason is pretextual, Abbasi argues that the 2003 PDP written by Helen Palmer said Abbasi met all expectations, and that Palmer stated Abbasi's work did not raise concerns. Pl. Mem. of Law in Opp'n to Defs'. Mot. for S.J. at 26. Abbasi testified at her deposition that she believed that Lancksweert was discriminating against her because of her national origin and Persian ethnicity. Def. Ex. 4, at 10:3-8. However, a reasonable factfinder could not find that the evidence offered by Abbasi is inconsistent with the proffered legitimate non-discriminatory reason that Lancksweert acted the way he did towards Abbasi because of her poor job performance.

First, the claim that Abbasi's 2003 PDP and 360 review feedback was inconsistent with Lancksweert's review (Abbasi's 2004 PDP) is not supported. Both her 2003 PDP and 360 reviews contained criticism similar to that of Lancksweert. Her 2003 PDP

13

referred to issues with "data quality and taking accountability for checking the integrity of reports and other output before allowing them to be published." Pl. Ex. 8. The results of the 360 reviews were not uniformly positive and contained the same complaints that Lancksweert had shared with her including lack of communication skills and errors in her reports that required others to double-check her work. Pl. Ex. 10.

The sections of Helen Palmer's deposition cited by Abbasi do not contradict the other evidence of inadequate performance. Plaintiff in her brief contends that Palmer noted that Abbasi met all expectations. The brief claims that Palmer purported to say that "Ms. Abbasi's level of work did not raise concern, and she did not recommend any remedial work or internal company discipline or training." Pl. Mem. of Law in Opp'n to Defs'. Mot. for S.J. at 26. The passage cited by Abbasi does state that in 2003 Palmer did not recommend additional remedial work or training. Def. Ex. 5, at 56:18-57:12. However, the context makes clear that Palmer had some issues with Abbasi's work. The passage before the section cited by Abbasi states: "[b]ut the area around -- needing to be addressed about the data quality and accountability, you know, I think that is important in that it does highlight that there were sort of process issues in how Mitra delivered her work." Def. Ex. 5, at 56:12-17. Palmer also stated that Abbasi met her "objectives" in delivering important reports but states "[t]here was a lot of rework that had to be done in delivering those reports." Def. Ex. 5, at 53:14-54:5.[2]

---

[2] For reasons not known to this court, the pagination for the deposition of Helen Palmer differs depending on which party's submitted copy is used. The substance appears to be the same. I cite to the defendants' copy pages that match in substance the pages cited by Abbasi in

Thus, the testimony of Helen Palmer does refute the proffered reason. Palmer's review of Abbasi and her comments during her deposition are positive but contain criticism that mirrors that of Lancksweert.

### b. The Testimony of Ernestine Mitchell

Additionally, Abbasi has claimed that Ernestine Mitchell concurred in her belief Lancksweert discriminated against her. Pl's Mem. of Law in Opp. to Def. Mot. for Sum. J. at 7. She states that Ernestine Mitchell "corroborated Ms. Abassi's beliefs concerning Lancksweert's motives, and testified that she believed that Lancksweert was acting out of bias, stereotype, and discrimination." *Id*.

However, the passage of the deposition on which Abbasi relies merely states that Abbasi had told Mitchell that she felt discriminated against and that the conflicts Mitchell saw were consistent with what Abbasi told her. It does not state that Mitchell agreed with Abbasi's characterization:

> Q Had Mitra ever expressed that sentiment to you?
> A Not by nation of origin.
> Q What sentiment did she express to you?
> A Some type of stereotype.
> Q That he was acting based on some stereotype. You just didn't know which stereotype, right? Is that what you're telling me?
> MR. MURPHY: Objection to the form of the question. That's number one. Do you understand the question?
> A Yes.
> MR. MURPHY: Okay. You may answer the question.
> A When she mentioned anything to me, the sentence, "influenced by biases and stereotypes that existed prior to meeting me," [from a statement Mitchell gave during the internal investigation meant] she expressed that she felt that he was

_____

her brief.

somehow treating her differently and she didn't know why.

Q Okay. Did she tell you that she thought those things that you just told me, that he was treating her differently and she didn't know why, when she first told you about the situation with Alex or when in the relationship did that happen?

A I don't remember exactly, but it was after we had gotten to know each other a bit.

Q Were you surprised when she told you that?

A No.

Q And why not?

A Because of the times that I had encountered their conversations or the way he seemed to talk with her in the presence of a group whenever I witnessed them talking with one other.

Q So, at first, what she was telling you was consistent with what you saw?

MR. MURPHY: Objection to form. You may answer.

A Yes, it seemed like there were some differences.

Mitchell's testimony implies that what she saw was consistent with Lancksweert treating Abbasi differently or harshly, but does not provide any evidence of a discriminatory motive. Later in the deposition Mitchell says that she did not think that Lancksweert discriminated against Abbasi based on *racial* stereotypes, but instead she thought that he was not easily able to follow Abbasi's style or thought process. Def. Ex. 8, at 67:12, 67:19-21.

### c. Criticisms of Abbasi's Language Skills

Abbasi did not directly raise the criticisms of her English-speaking ability in responding to the summary judgment motion regarding pretext. I mention it now because a jury is entitled to rely on evidence of discriminatory intent to evaluate whether race or ethnicity is a motivating factor. The criticisms of plaintiff's ability to speak English could be evidence from which a reasonable factfinder might be able to infer that Lancksweert was acting based on a discriminatory motive rather than simply frustration with what he

16

perceived to be deficiencies in her work. Other courts have noted that "'language may be used as a covert basis for national origin discrimination.'" *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1170 (10th Cir. 2007) (quoting *Garcia v. Gloor*, 618 F.2d 264, 268 (5th Cir. 1980)). Arguably, language could also be used as a proxy for discrimination on grounds of race or ethnicity.

However, Lancksweert's comments about her proficiency in English were, according to Abbasi, directed at taking time to think about questions before answering them, and the fact that he believed she did not understand what he or clients were asking her to do. Def. Ex. 4 (Pl's Dep.), at 21:20-22:4. These were concerns shared by her peers in her 360 review which noted that co-workers stated that Abbasi "could benefit from courses covering interpersonal communication" and that she "could be clearer in her delivery of the messages she wants to give." Pl. Ex. 10. Another employee of GSK, Carmeline Godwin reported that she had received complaints about the meeting Abbasi ran for members of her team. Def. Ex. 6 (Godwin Dep), at 47:10-48:23. A reasonable factfinder could not conclude that the comments about Abbasi's speaking abilities were racially motivated, given that her co-workers without contradiction noted that her poor communication skills affected her job performance.

The comments about her ability to speak English were all responsive to concerns about her job performance. These were not comments, such as complaining about an employee speaking with an accent, that in context might provide an inference of discrimination. The criticisms of Abbasi's communication skills, combined with the

17

other evidence, do not provide a basis for a reasonable basis for a jury to find that race or ethnicity was a motivating factor in Lancksweert's actions.

**d. Consistency of Proffered Legitimate Non-Discriminatory Reason**

Lastly, Abbasi claims that the changing nature of the defendants' proffered reasons provides a basis for a reasonable jury to conclude that the proffered reason is pretextual. Pl. Mem. of Law in Opp'n to Defs'. Mot. for S.J. at 26.   However, Abassi's brief does not cite any evidence supporting this assertion, nor does the brief provide the substance of these purported alternative reasons.  Based on the evidence submitted to the court, the proffered reason has been consistent throughout Abbasi's employment and this litigation. Lancksweert cited concerns about her job performance in her review, (a) when preventing her from working from home, (b) in emails, and (c) in front of others during meetings. The defendants proffered the same reason in this litigation.

Abbasi has not been able to show the "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" required to avoid summary judgment.  This court has found that a reasonable factfinder would not find the proffered explanation of poor job performance pretextual, when the allegedly deficient conduct was facially-neutral criticism of a plaintiff's performance and the proffered reason was supported by evidence.  *James v. Allentown Bus. Sch.*, No. Civ.A 01-857, 2003 WL 21652189, at *15-17 (E.D. Pa. June 2, 2003).  A reasonable factfinder could neither (1) disbelieve the employer's articulated legitimate

reason, nor (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action, since Abbasi has not brought forth any evidence supportive of a finding that Lancksweert was acting out of a discriminatory motive rather than simply out of frustration with what he, and others, perceived was poor job performance.

### C. Hostile Work Environment

To establish a *prima facie* case for a hostile work environment claim, the plaintiff must show that 1) she suffered intentional discrimination because of her race, 2) the discrimination was sufficiently severe or pervasive to constitute an objective change in the conditions of employment, 3) she was adversely affected by the discrimination, 4) the discrimination would have adversely affected a reasonable person of the same race, and 5) there is a basis to impute liability to the defendant. *Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001). "[T]he advent of more sophisticated and subtle forms of discrimination requires that [the court] analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim." *Cardenas v. Massey*, 269 F.3d 251, 261-62 (3d Cir. 2001).

Abbasi need not have presented direct evidence of discrimination to satisfy the first element of a *prima facie* case of a hostile work environment clam, but she has failed to present even circumstantial evidence that would allow a reasonable factfinder to infer that Lancksweert subjected her to intentional discrimination because of her race. A poor

working relationship does not on its own provide the basis for an inference of intentional discrimination. *See Walton v. Mental Health Ass'n. of Southeastern Pennsylvania*, 168 F.3d 661, 667 (3d Cir. 1999) (stating, while granting a summary judgment for a hostile work environment claim based on disability, that "[a]lthough it is clear that the relationship between [the parties] was poor, [plaintiff] has not asserted facts that would allow a reasonable jury to find that [the defendant] harassed her because of her disability."); *James v. Allentown Bus. Sch.*, 2003 WL 21652189, at *13-15 (E.D. Pa. June 2, 2003) (finding that a poor working relationship and demeaning conduct alone does not provide a basis for an inference of discrimination). Viewing the facts in the light most favorable to Abbasi, none of the allegedly hostile conduct gives rise to a reasonable inference that Lancksweert was acting out of racial bias.

First, the public criticism and yelling happened more frequently with Abbasi but, according to Abbasi, Mitchell, and others, the criticism was focused on perceived deficiencies in Abbasi's work. Both her 2003 PDP and the 360 reviews mentioned the same issues that Lancksweert complained of. For the same reasons, the 2004 PDP and email complaints about Abbasi's work do not support a reasonable inference of discrimination by Lancksweert on the basis of Abbasi's Persian ethnicity.

Given the context of concerns about Abbasi's performance, Lancksweert's decision to limit Abbasi's ability to work from home does not give rise to an inference that he was acting out of discriminatory motives. No information has been provided that implies that those who were allowed to work from home were similarly situated to

Abbasi, both in terms of their ethnicity and whether anyone had similar performance issues. According to Abbasi's deposition testimony, Lancksweert explained that he felt she needed to be in the office so he could help her improve her performance. Def. Ex. 4 (Pl's. Dep), at 35:20-23.

The fact that other members of the Metrics team who had less experience at GSK were staffed to a project instead of Abbasi similarly does not support a reasonable inference of discrimination. Abbasi did not know whether Niall Devine and the unidentified female co-worker had more experience than Abbasi before coming to GSK that would have justified their being staffed to the project instead of her.

Other incidents may seem petty and abusive, such as preventing Abbasi from attending a local conference on metrics and presenting her with the job description of a position junior to her own and asking if she wanted to do that job. However, such actions, even when taking all reasonable inferences in Abbasi's favor, do nothing more than highlight a deteriorating work relationship.

The totality of the incidents does not support a reasonable inference of intentional discrimination by Lancksweert. Almost all of the incidents were directly tied to concerns about Abbasi's work. The other incidents do not, in context, show any discriminatory animus, direct or implied. Because Abbasi has failed to come forth with evidence, direct or circumstantial, that ties the alleged adverse actions by Lancksweert to intentional discrimination, her hostile work environment claim fails.

### D. Retaliation

To establish a *prima facie* case of retaliation, plaintiff must show that 1) she engaged in protected activity, 2) the employer took an adverse employment action against her, and 3) a causal relationship exists between the protected activity and the adverse employment action. *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 501 (3d Cir. 1991). Defendants concede the reporting Lancksweert's conduct was protected activity but they argue that there is no evidence of either an adverse action or a causal relationship between an adverse action and the protected activity. Def's. Mot. for Summ. J., at 32-33. Abbasi citing to page 75, lines 4-15 of her deposition, contends that her testimony included a statement that Lancksweert's conduct towards her worsened. Pl's. Mem. of Law in Opp'n to Def's. Mot. for Summ. J., at 28. The passage does not support a claim of retaliatory conduct. The passage states:

> Q. Is there any other reason that you believed prior to this exchange that Alex Lancksweert's conduct towards you was, as you see it, intentional?
> A. Yes. Ask -- telling him I am going to attend my youngest son award ceremony at school, and replying with a harsh e-mail saying that you are taking too many days off, you are never here, you work from home, your performance lacks, you are involving extra-curriculum activities at work, we need to talk. That was his response to a sweet and trying to share my happy time with -- with someone. And that's the respond [sic] I got to the happy news.

Def. Ex. 4, at 75:4-15. Abbasi's brief fails to tie the incident described to the protected activity in any relevant way. The brief does not even clarify whether this incident happened after the protected activity.

Abbasi also attempts to rely on timing, which in some situations can give rise to an

inference that the events were causally related. *Woodson v. Scott Paper Co.,* 109 F.3d

913, 920 (3d Cir. 1997). However, the temporal relationship between any of the events

has not been laid out by Abbasi in a fashion satisfying such an inference. It is unclear

what, if any, events took place after the protected activity and, if they did, how long after.

Abbasi cannot rest on the "mere allegations or denials of [her] pleading" because "the

nonmoving party must come forward with 'specific facts showing that there is a genuine

issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*. 475 U.S. 574,

586-87 (1986) (quoting FED. R. CIV. P. 56). Abbasi has failed to meet the burden of

providing sufficient evidence of her retaliation claim.

## III.  Conclusion

For the reasons stated above, I conclude that there are no triable factual disputes in

this suit and all defendants are entitled to judgment as a matter of law. An appropriate

order follows.